*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-1809

In the Matter of the Welfare of the Child of: J. M. B. (Mth)
and I. C. R. (Alleged Fth) and any Unknown Father, Parents.

**Filed April 22, 2024**
**Reversed**
**Ede, Judge**

Stearns County District Court
File No. 73-JV-21-2446

Kimberly Stommes, Jeddeloh Snyder Stommes, St. Cloud, Minnesota (for appellant-mother J.M.B.)

Carrie A. Doom, McKinnis & Doom, P.A., Cambridge, Minnesota (for respondents adoptive parents)

Janelle P. Kendall, Stearns County Attorney, Elizabeth A. Lee, Assistant County Attorney, St. Cloud, Minnesota (for Stearns County Human Services)

McKayla Masog, St. Cloud, Minnesota (guardian ad litem)

Considered and decided by Ede, Presiding Judge; Reyes, Judge; and Larson, Judge.

## NONPRECEDENTIAL OPINION

**EDE**, Judge

Following the voluntary termination of her parental rights, appellant challenges the denial of her motion to enforce a contact agreement for visitation with her biological daughter. In the alternative, she seeks relief from the order terminating her parental rights and to reopen the subsequent adoption proceedings. Because we conclude that the district court erred in determining that the contact agreement was unenforceable, we reverse.

**FACTS**

This appeal arises from appellant J.M.B.'s motion to enforce a contact agreement for visitation with her biological daughter (the child). We first provide background about the termination of J.M.B.'s parental rights and the child's adoption by respondents, before turning to J.M.B.'s effort to enforce the agreement.

*Termination of Parental Rights and Adoption*

The child was born in December 2020, and placed with respondents two days after birth as part of an emergency protective hold. In April 2021, Stearns County Human Services (the county)[1] petitioned to terminate J.M.B.'s parental rights to the child. The petition set forth factual allegations regarding J.M.B.'s intellectual disabilities and her inappropriate behavior towards the child postpartum. J.M.B. has a guardian and, at the time of the petition, received daily assistance from the county's developmental disabilities unit.

In June 2021, J.M.B. and her guardian signed a consent to voluntarily terminate J.M.B.'s parental rights. The county filed J.M.B.'s consent and a contact agreement stating:

> That [J.M.B.] and [the county] agree based on the voluntary termination of parental rights, that [the county] will assure any adoptive parents are in agreement with the following contact agreement:
> 1.     That the mother is entitled to face-to-face visitation two (2) times per year as long as she keeps in contact with the adoptive parents.
> 2.     That any future adoptive family shall establish [an online] account for the mother to have access to photos of the child.

---

[1] The county took no position on J.M.B.'s motion to enforce the contact agreement in the district court, and the district court granted the county's request to be excused from those proceedings. The county also informed this court that it takes no position in this appeal.

The agreement was signed by J.M.B., her guardian, the county, and the child's guardian ad litem, but it was not signed by respondents. On June 21, 2021, the district court filed an order terminating J.M.B.'s parental rights. The order stated that "[J.M.B.] and [the county] did enter into a contact agreement for the child which is attached and incorporated by reference into this order."

Respondents filed a petition to adopt the child on November 17, 2021. The documents submitted with respondents' petition included a proposed decree, the order terminating J.M.B.'s parental rights, and a copy of the June 2021 contact agreement. The final adoption decree, consistent with the proposed decree, includes the finding that: "A communication or contact agreement, if applicable, is on file with the Court and, if one is on file, the Court finds that such agreement is in the child's best interests."

***Proceedings Related to the Contact Agreement***

After the adoption, J.M.B. had one in-person visit with the child in December 2021. Respondents also uploaded photos of the child to the online account contemplated in the contact agreement. Respondents, however, did not reply to J.M.B.'s requests for visits during 2022.

J.M.B. moved to enforce the contact agreement in March 2023 by filing a motion in the juvenile-protection file. Respondents thereafter filed a motion requesting that the district court deny J.M.B.'s motion and modify the contact agreement so that contact was at their sole discretion. The district court appointed a new guardian ad litem, and the parties agreed to argue the motions after the guardian ad litem completed a report.

3

Following filing of the guardian ad litem's report, the district court held a hearing on J.M.B.'s motion to enforce the contact agreement and on respondents' motion to modify the contact agreement. At the hearing, the guardian ad litem stated that, consistent with her report, the contact agreement should be modified to allow only supervised virtual—rather than in-person—visits.

During the hearing, J.M.B. argued that the district court should "enforce the contact agreement as is." Respondents argued, for the first time, that the agreement was not enforceable under Minnesota Statutes section 260C.619 (2022) and not "a binding agreement" on respondents. In the alternative, respondents argued that the contact agreement was not in the child's best interests and "that any contact [should] be at the sole discretion of the adoptive parents." At J.M.B.'s request, and with respondents' agreement, the district court stated it would "take judicial notice" of the adoption file.[2]

Following the hearing, the parties submitted letter briefs setting forth their respective positions. J.M.B. maintained that the district court should enforce the agreement or, if it did not, that the adoption proceeding should be reopened and the order terminating

---

[2] Generally, judicial notice in civil matters is governed by Minnesota Rule of Evidence 201. *See* Minn. R. Evid. 201 1989 comm. cmt. (noting that rule 201 "is applicable only in civil cases"). In juvenile-protection matters, the scope of material a district court may judicially notice is broader than in civil matters and in adoption matters. *Compare* Minn. R. Juv. Prot. P. 3.02, subd. 3 (identifying material a district court may judicially notice "[i]n addition to the judicial notice permitted in the Rules of Evidence") *with* Minn. R. Adopt. P. 3.02 (stating that "[t]he Minnesota Rules of Evidence apply to adoption matters"). The current appeal is taken from a ruling in a juvenile-protection file. Consistent with the district court's review and the parties' agreement, this court also reviewed the related adoption file. We express no position on whether the district court's review of the adoption file falls within the scope of Minnesota Rule of Evidence 201 and Minnesota Rule of Juvenile Protection Procedure 3.02, subdivision 3.

her parental rights should be vacated. Respondents countered that the contact agreement was unenforceable against them and that vacating the adoption decree was untimely. In the alternative, respondents asserted that modification of the agreement was in the child's best interests.

On November 20, 2023, the district court denied J.M.B.'s motion to enforce the contact agreement. The district court found that "the contact agreement was filed in the adoption file" and that the adoption decree "stated that a contact agreement is in the court file and in the child's best interest." The district court also found that "adoptive parents and child had a face-to-face visit with [J.M.B.]" and "adoptive parents started and maintained [an online] account per the terms of the contact agreement." But the district court determined that the agreement did not satisfy section 260C.619, reasoning that "[t]here is no signed written enforceable agreement to provide ongoing contact between [J.M.B.] and adoptive parents." The district court did not rule on respondents' motion to modify the contact agreement.

J.M.B. appeals.

**DECISION**

J.M.B. challenges the district court's denial of her motion to enforce the contact agreement regarding visitation with the child.[3] In the alternative, J.M.B. argues that she is

---

[3] Minnesota Statutes section 260C.619(h) provides that "[a]n order regarding communication or contact entered under this section may be enforced by filing a motion in the existing adoption file with the court that entered the contact agreement." J.M.B. filed her motion to enforce the contact agreement in the juvenile-protection file, not the adoption file. *Cf.* Minn. R. Juv. Prot. P. 2.01(19) (defining a "[j]uvenile protection matter" without including proceedings under section 260C.619); Minn. R. Adopt. P. 2.01(4) (defining an

5

entitled to reopening of the adoption proceeding and to relief from the order terminating her parental rights. Because we conclude that the contact agreement is enforceable, we do not reach J.M.B.'s other claims of error.[4]

The district court determined that there was no enforceable agreement under Minnesota Statutes section 260C.619. J.M.B. maintains that the district court erred "because the terms of the contact agreement are contained in a written court order— namely, the adoption order." Respondents contend that the district court properly determined that the contact agreement was unenforceable. We agree with J.M.B.

Section 260C.619 provides that "[a]n adopting parent and a relative or foster parent of the child may enter into an agreement regarding communication with or contact between the adopted child, adopting parent, and the relative or foster parent." Minn. Stat.

---

"[a]doption matter"—with an exception not relevant here—to include a "proceeding under Minnesota Statutes §§ 260C.601-.637"). Neither the county nor respondents objected to proceeding in the juvenile-protection file in the district court, and respondents did not raise this issue on appeal. We therefore do not address whether the district court erred in ruling on J.M.B.'s motion in the juvenile-protection file. *See Thiele*, 425 N.W.2d at 582; *see also In re E.M.B.*, 987 N.W.2d 597, 600 n.5 (Minn. App. 2023) ("Minnesota appellate courts decline to reach an issue in the absence of adequate briefing." (quotation omitted)).

[4] As discussed above, the district court did not rule on respondents' motion to modify the contact agreement. Thus, as much as J.M.B. challenges any potential modification, that challenge is premature and not properly before this court. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (explaining that appellate courts will generally not consider an issue "if it was not passed on by the trial court" (quotation omitted)). We express no position about the merits of respondents' motion to modify the contact agreement, which remains pending before the district court, unadjudicated. We also decline to consider J.M.B.'s arguments related to contempt because she did not make such a request or motion before the district court. *See id.* ("A reviewing court must generally consider only those issues that the record shows were presented and considered by the trial court in deciding the matter before it.").

§ 260C.619(a). A contact agreement need not be signed by the birth relatives or prospective adoptive parents to be enforceable. *In re Welfare of L.L.P.*, 836 N.W.2d 563, 572 (Minn. App. 2013); *see also* Minn. Stat. § 260C.619. Rather, "[a]n agreement regarding communication with or contact between the child, adoptive parents, and a relative or foster parent, is enforceable when the terms of the agreement are contained in a written court order." Minn. Stat. § 260C.619(b). "Application of a statute to the undisputed facts of a case involves a question of law, and the district court's decision is not binding on this court." *In re Est. of Rutt*, 824 N.W.2d 641, 645 (Minn. App. 2012) (quotation omitted), *rev. denied* (Minn. Jan. 29, 2013). We review such questions of law de novo. *Id.*

We conclude that, based on the specific circumstances of this case and the district court's undisputed factual findings, the contact agreement's terms are contained within the adoption decree for the purposes of section 260C.619(b). An agreement, if used as the basis for a final order, merges with that order. *Cf. In re Welfare of Child of D.J.T.*, 998 N.W.2d 772, 780 (Minn. App. 2023) (concluding that, "when the district court accepted appellants' consents to adoption and transferred custody of [the child] to the commissioner, appellants' consents effectively merged into that order"), *rev. denied* (Minn. Jan. 29, 2024); *Shirk v. Shirk*, 561 N.W.2d 519, 522 (Minn. 1997) ("[W]hen a judgment and decree is entered based upon a stipulation, we hold that the stipulation is merged into the judgment and decree and the stipulation cannot thereafter be the target of attack by a party seeking relief from the judgment and decree."). And here, the district court found that "[J.M.B.] entered into a contact agreement regarding the child" and that "the contact agreement was filed in the adoption file." The district court further found that the adoption of the child "was granted

7

to [respondents]" and that the adoption decree "stated that a contact agreement is in the court file and is in the child's best interest." Indeed, because the adoption court accepted the contact agreement and found that the agreement is in the child's best interests, the contact agreement merged into the final adoption decree and satisfies section 260C.619(b). *Cf. D.J.T.*, 998 N.W.2d at 780.

Respondents contend that, even if J.M.B. entered into an agreement, the district court properly determined that the contact agreement is not enforceable *against them*. Citing section 260C.619(d), respondents assert that they "did not consent to the terms in writing." We are unpersuaded.

Subpart (d) of section 260C.619 states that "[t]he court shall not enter a proposed order *unless the terms of the order have been approved in writing* by the prospective adoptive parents, the birth relatives . . . and the responsible social services agency." Minn. Stat. § 260C.619(d) (emphasis added). It is undisputed that J.M.B. and the relevant social services agency approved the terms of the contact agreement that merged into the final adoption decree.

Based on our review of the adoption file, the documents supporting respondents' petition to adopt the child included: (1) a proposed decree stating that a contact agreement is on file and in the child's best interests; (2) the order terminating J.M.B.'s parental rights, which incorporated the contact agreement; and (3) a copy of the June 2021 contact agreement, which states that "mother is entitled to face to face visitation two (2) times per year as long as she keeps in contact with the adoptive parents" and "any future adoptive family shall establish [an online] account for the mother to have access to photos of the

8

child." Consistent with the proposed decree, the final adoption decree expressly found that a contact agreement is on file and in the child's best interests. Because respondents submitted the proposed decree and the contact agreement itself when petitioning to adopt the child, we reject respondents' contention that they did not approve "the terms of the order" in writing. *See* Minn. Stat. § 260C.619(d).

Our conclusion is also reinforced by respondents' conduct following the adoption. The district court found that "adoptive parents and child had a face-to-face visit with [J.M.B.]" and "adoptive parents started and maintained [an online] account *per the terms of the contact agreement*." (Emphasis added.) And, rather than immediately asking that the district court rule that the contact agreement is unenforceable or that the district court strike the adoption decree's reference to the agreement, respondents' initial response to J.M.B.'s motion to enforce the agreement merely requested that the district court *modify* the agreement. Although our analysis that the agreement satisfies the requirements of section 260C.619 does not rely upon these undisputed facts, we note their consistency with our conclusion that an enforceable contact agreement exists between J.M.B. and respondents.

In sum, the district court erred by denying J.M.B.'s motion to enforce the contact agreement.

**Reversed.**